OPINION OF THE COURT
Leonard Silverman, J.
This is a claim for damages resulting from the permanent appropriation by the State of New York of claimants’ property located at Middle Country Road, Smithtown, and acquired by the State pursuant to section 30 of the Highway Law in connection with a proceeding described as Smithtown Branch, Coram, State Highway 8268 (Nesconset Interchange).
The premises are shown as parcel No. 502 on map 396 dated June 6, 1974. Notice of appropriation was served on the claimants on April 7, 1975 and the claim was timely filed on September 30, 1975.
Adopted as accurate is the description of the appropriated property as shown on the maps and descriptions filed in the office of the County Clerk of the County of Suffolk, copies of which are attached to the claim.
The court has made the statutory view of the property which is the subject of this claim. In view of various statements and asseverations made at the trial with regard to the possible uses of the property and particularly in connection with the so-called "corner influence”, the court has attached considerable importance to the viewing in its application of the oral testimony to the evidence presented (Matter of City of New York [A. & W. Realty Corp.], 1 NY2d 428, 432).
Proof of ownership of the property was established by certified copies of deeds conveying title to the claimants.
The subject property consisted of a parcel of land of approximately 9.108 acres (396,737 + square feet), which together with two smaller noncontiguous parcels totaling an additional 5 + acres, was all that was left to the claimants from an original assemblage of over 80 acres on the south side of Middle Country Road (Jericho Turnpike and State Route 25) and directly across the highway from the sprawling Smith Haven Mall.
The subject property was zoned "WS 1” which allowed for a variety of commercial uses and, based upon the evaluations in all six of the appraisals submitted by the parties, was in conformity with its highest and best uses.
The entire property had originally been acquired by the *528 claimants from Nesconset Properties, Inc., a wholly owned subsidiary of R H. Macy and Co., Inc., which had originally intended to erect the Smithtown Mall on that location. Having found it impossible to assemble the entire parcel it required, it instead acquired a larger parcel on the north side of the highway and sold its assemblage on the south side to claimants. Because of the mall it contracted to have constructed on the north side, its conveyance to the claimants was subject to a restrictive covenant limiting the development of the 80 + acres to residential one-family homes except for the first 150 feet south of the turnpike.
It is the validity and effect, if any, of the restrictive covenant that constitute the focal point of the differences between the parties.
Claimants contend that the restrictive covenant was void for failure of consideration. The bases for this argument are the facts that the subject property was owned, not by Macy’s itself, but by Nesconset Properties, Inc. (a wholly owned subsidiary), and that at the time that Nesconset sought to impose the covenant it had already conveyed the Smith Haven Mall property to Winston Mall, Inc., the developer.
We reject this argument. The record is clear that Macy’s, at all times, maintained interests in the properties involved, whether contractual, by leasehold or through wholly owned corporations which served as its alter ego. Furthermore, the restrictive covenant, as written, made clear that it inures to the benefit, not only of the landowners, but of Macy’s as well. "The enforcement of a restrictive covenant in equity rests upon equitable principles, and a breach of such a covenant may be restrained at the suit of one who owns property or for whose benefit the restriction was established, irrespective of whether there was privity either of estate or of contract between the parties.” (13 NY Jur, Covenants and Restrictions, § 113.) The case of Larpeg Realty Corp. v McGrath (262 App Div 1041) is inapposite. In that case the grantor gratuitously and without consideration, attempted to restrict land in accordance with a prior unrecorded agreement to which no other purchaser had been held.
Claimants propounded and valiantly presented yet another theory pursuant to which they claimed the covenant invalid. By means of testimony of a former regional director of the Federal Trade Commission, now an attorney in private practice, claimants aspired to depict the covenant as being an *529 illegal restraint of trade. The court found his testimony to be highly interesting, most enlightening, but thoroughly unconvincing. This "expert testimony” was focally concerned with what he felt should be the case rather than the kind of treatment actually afforded to situations such as at bar. Particularly pertinent to our determination of this facet of claimants’ case were the witness’ asseverations that the restriction in question "ought to be tested * * * to establish a precedent”.
On the bases of all the testimony and evidence adduced at the trial of this action, we have no alternative but to deem the restrictive covenant both valid and enforceable. The real question to be considered, however, is its likelihood of removal, as a factor in valuation.
Because "the New York case law on the effect to be given a potentially value-depressing restrictive covenant is sparse” (Lanzilatta v State of New York, Ct of Claims, Aug. 22, 1977, Rossetti, J.), and because those few decisions in this country which do deal with the subject "are in almost hopeless conflict” (Matter of Board of County Comrs. v Thormyer, 169 Ohio St 291) this court in determining valuation will attempt to clarify its application of what we consider to be the New York rule.
The Supreme Court of Ohio, in the Thormyer decision cited, enumerated three possible approaches to the valuation of land encumbered by a restrictive covenant.
The first of these possible conclusions and the one adopted by a majority of English courts, is that no consideration should be given to the restrictions and that the land be valued as if the restrictions did not exist. This, of course, is the position claimants would prefer the court to take.
The second possible approach, and the one that seems to have been adopted by a majority of jurisdictions, is that full consideration should be given to such restrictions. The able Assistant Attorney-General urges that this is the conclusion adopted by the Appellate Divisions of this State.
The third possible conclusion is that consideration should be given to the restrictive covenant and also to the possibility of its removal by legislative or other means. Although the court in Thormyer (169 Ohio St 291, 295, supra) stated that "[w]e have found no decisions in this country that have approved the third conclusion”, this court on the trial of this action accepted, subject to later determination, evidence as to the *530 possibility and/or probabilities of removal of the restrictive covenant.
The Thormyer (169 Ohio St 291, 298, supra) court, in discussing the three alternatives available, dismissed the third possible solution on the grounds that it "has a very serious disadvantage in that it greatly complicates the problem of determining the amount of the award by introducing an additional question to be considered by the jury in making that determination, i.e., the question as to the chance of a legislative or some other elimination of the restrictions involved. * * * In our opinion, the uncertainty and confusion that would be created by requiring a jury, in determining the amount of its award, to evaluate such a nebulous factor would outweigh any theoretical advantage that the third solution might provide.”
Recognizing that each of the other two solutions would provide (supra, p. 298) “a choice of one of two apparently undesirable results, — (1) a windfall to the owner or (2) a corresponding windfall to the appropriator”, the Ohio high court determined that it is (supra, p 299) "less unreasonable to permit the owner to get a windfall (especially where the appropriator is not required to pay more than the property is worth) than to permit the appropriator to get a corresponding windfall.”
A different result was reached in Florida where, after discussing the "windfall” approach and the three possible rationales outlined above, the court, on appeal, held: "The majority rule in this country, to which we adhere, is that full consideration should be given to restrictive covenants such as [are] here involved without consideration as to the chance of removal thereof.” (Staninger v Jacksonville Expressway Auth., 182 So2d 483, 487 [Fla].) The Florida court reasoned that "to eliminate such covenants would result in giving to the owner a windfall at public expense in that he would obviously be paid more than the property is worth in contemplation of the uses for which he purchased it” and that testimony as to possible removal of the restrictions is, of necessity "so speculative as to be inherently inadmissible.” (Staninger, 182 So2d 483, 488 [Fla], supra.)
Although there have been several New York cáses which concerned property the use of which was restricted by covenants, the status of New York law as it concerns the three possible approaches remains somewhat unclear.
*531 In Tonawanda v State of New York (50 Misc 2d 3), the Court of Claims, relying on the Ohio Supreme Court opinion in Thormyer (169 Ohio St 291, supra) held that land should be valued on an unrestricted basis. While the award in that case was upheld on appeal (28 AD2d 644), the ground for upholding it was that "[t]he nature of the restrictive covenant on the facts before us did not affect the fair market value of the land to the claimant town”. The Fourth Department Appellate Division emphasized, however, that "[t]his affirmance, however, should not be construed as establishing the principle that the value of the land subject to various kinds of restrictions may not be affected by the restrictions.”
While the court refused to establish or confirm the principle asserted in the lower court, which would have granted a "windfall” to the owner by valuing his property as if it were unrestricted, it likewise failed to affirmatively assert whether land is always to be valued on its restricted use or whether the probabilities of removal of the restrictions are factors to be considered.
A recent Third Department decision, Nash v State of New York (61 AD2d 852), heavily relied on by the State, seems to take an explicit position diametrically opposite to that enunciated by the lower court in Tonawanda (50 Misc 2d 3, supra).
"On this appeal, claimants initially argue that the trial court erred in concluding that the deed restriction was the sole factor in determining a residential highest and best use for the parcel prior to the appropriation. We cannot agree. In this State, the valuation of land subject to a deed restriction is predicated upon the restricted use value”. (Nash v State of New York, supra.)
On the basis of this holding, the State urges that the court value the land as restricted and that although the court must consider the validity of the deed restrictions, no weight be given to the possibility of their removal by legislative or other means such as negotiations.
We disagree. On the basis of a careful reading of all the relevant New York case law, it is our opinion that the New York law holds that full consideration should be given to the effect of a restrictive covenant but that consideration should also be given to the possibility of its removal or termination. (Cf. Lanzilatta v State of New York, Ct of Claims, Aug. 22, 1977, Rossetti, J., supra.)
*532 The New York rule in appropriation cases has always been the fair market value under the willing buyer and seller test. "[A] property owner is entitled to show, as affecting the question of value, any fact which he would naturally and properly bring to the attention of a buyer with whom he is negotiating a sale.” (Schwartz, A Current Look at New York Condemnation, Practicing Law Institute, p 30.) Certainly the probability of removal of a restriction by simple agreement of the parties thereto is a factor to be considered by a willing buyer and seller in determining a price. "To hold otherwise would be entirely unrealistic and contrary to the most rudimentary business principles.” (Concurring opn of Wigginton, J., Staninger, 182 So2d 483, 490 [Fla], supra.)
Although this approach was dismissed by the Ohio Supreme Court as being impractical and impossible, we believe it not only represents New York law but is also part of a trend being adopted in various jurisdictions. (31 U of Pitt L Rev 128.)
Moschetti v City of Tucson (9 Ariz App 108), an Arizona Court of Appeals case, discussed the ramifications of the three possible rationales. As at bar, the Moschetti court was confronted with two basic issues, the resolutions of which was a prerequisite to proper evaluation in an eminent domain proceeding; first, whether the evaluating court may or must consider the effect of a restrictive covenant in determination of market value, and secondly, if such consideration is permitted whether the possibility and probability of removal through legislative, private or other proceedings is also to be considered.[1]
The Arizona Court of Appeals, in rejecting the argument that the land should be valued as unrestricted (as the Court of Claims did in Tonawanda, 50 Misc 2d 3, supra), or that only the party for whose benefit the covenant was enacted may enforce the covenant, stated that "[t]he restrictions are enforceable on their face, and having acquired the land subject thereto, appellant is not in a position to insist that his land be valued as if the restrictions did not exist.” (Moschetti, 9 Ariz App 108, 111, supra.)
The court held, however, that considerations of the possibility of the removal of the restrictions could significantly affect *533 present market value. Accordingly, the court determined that testimony as to possible removal of the restrictions is admissible.
"Evidence which has a material bearing on market value should be admissible, without regard to whether it relates to an eventuality that might or might not occur in the 'near’ or more 'distant’ future, as long as the prospect of the event has substantial present influence on market value.” (Moschetti, 9 Ariz App 108, 113, supra.)
In the case at bar, claimants contended, and, over objections, were allowed to introduce evidence, that the restrictive covenant would readily have been removed by agreement of the parties to those covenants.[2] This court is in agreement with the concurring opinion of Judge Wigginton in Staninger (182 So2d 483, 489-490 [Fla], supra), that: "If the probability or likelihood that covenants restricting the use of land for purposes lower than its highest and best use are about to expire by their own terms or be removed, or may readily be removed either by agreement of the parties to such covenants, or by judicial decree, the landowner whose property is sought to be taken by eminent domain should receive the benefit of such a contingency”.
The interests of justice and the policy of the State would require consideration of contingencies, such as at bar, in effecting a valuation, and we so hold.
The problem, however, lies, as well recognized by the Ohio court in Thormyer (169 Ohio St 291, supra) in properly evaluating a factor such as the possible removal of a restriction. And assuming even that an accurate monetary price tag could be placed on the restriction, its value to the dominant estate, should this dollar amount be treated as an increment to the restricted value or as a discount or reduction from the unrestricted value? Careful analysis will show that notwithstanding a logical hypothesis to the contrary, there could be a *534 vast practical difference to the two approaches, further exacerbating the problem of valuation.
Complicating this problem still further under the particular facts of the case at bar, is the fact that, of the six appraisals submitted, only one is based on a fully restricted valuation. All the other appraisals submitted, even the claimants’ two supplementary appraisals, both of which aspire to present value of the property "as restricted”, take into consideration what one of claimants’ appraisers terms the "almost certain” probability of the removal of the restrictive covenant.
Claimants’ confidence with reference to probable removal of the restrictive covenant is not entirely misplaced. On the bases of all the evidence and testimony adduced at the trial, we find that the restrictive covenant, as drawn, would have been withdrawn. We find, however, that the restrictions would not have been removed in totality, that the land would have remained encumbered and that Macy’s and the owners of the dominant estate would have continued to exercise a degree of control thereover with a resultant diminution in value (which still further complicates the appraisal problem).
The original rationale for the restrictive covenant placed on the land claimants purchased from Macy’s subsidiary was primarily to preclude the construction of a competing shopping center on that 80 + acre parcel. At closing of title the claimants simultaneously conveyed the rear 66 + acres to a developer for residential construction. It was alleged that at that closing, claimants inquired of Macy’s officers as to the necessity of the covenant and were advised, indubitably because a parcel of 14 acres is insufficient for a shopping center, that removal of the restrictions could be effectuated at some later date.
Claimants called both the senior attorney in Macy’s legal department who drafted the covenant, and also the vice-president and general attorney for R. H. Macy and Company, Inc. Both testified, and we have no reason to disbelieve their testimony, that the restrictive covenant would not have been enforced and that "Macy’s under proper circumstances would have modified or waived the covenant”. Testimony from an investment manager for Prudential Insurance Company of America, the title holder of the property on which the Smith Haven Mall is located, further confirmed and reaffirmed the probability of release of the restrictions, given proper circumstances and for certain enumerated uses.
*535 Consistent throughout the testimony of all three men was the feeling that in all probability no consideration would have been demanded from claimants for the release of the restrictions and, just as importantly, that the specific usage to be made of the property would have come under the strong scrutiny of the individuals responsible for effectuating the release or waiver.
Because the subject property is zoned "WS 1”, claimants’ counsel while questioning his witnesses, enumerated those uses permitted under that type of commercial zoning. Both Messrs. Mersack and Nee, the Macy’s representatives, expressed doubt that, notwithstanding that a funeral parlor or similar usage is a permitted use under the applicable zoning ordinance, it would or should be allowed on the subject property because of a possible "depressing effect” it might have on shopping center patrons.
The testimony of the Prudential officer further served to confirm that the removal of the restrictive covenant would not have been total and that, at best, the property would remain encumbered with restrictions which would be waived on a case-by-case basis depending on the attractiveness of the proposed usage.
We find, therefore, that although the restrictions were subject to ultimate removal to accord with a usage consistent with its highest and best use, the release would of necessity be subject to the review or approval of outside factors. We hold that his reviewability constitutes a dampening effect on market price and requires a further adjustment in valuation.
As we cited earlier, the Ohio Supreme Court, in Thormyer (169 Ohio St 291, supra) deemed the task of just valuation of land encumbered with a restrictive covenant as well nigh impossible where the removal of the covenant is a factor to be considered. Although we refuse to accept a determination of "impossible”, we concede the difficulties we experienced in attempting to develop a systematic approach to the analyses of the appraisals presented.
Although prior New York cases concerned themselves with valuation of restricted land, these cases invariably found either that the covenant had no "cognizable effect on subject’s market value” (Lanzilatta v State of New York, Ct of Claims, Aug. 22, 1977, Rossetti, J., supra), or that the covenant had the total effect of making the land worthless (Maretski v State of New York, 40 AD2d 891).
*536 In the case at bar, however, the effect of the restrictive covenant was to reduce value by 57% according to the State’s appraiser. Even one of claimants’ appraisers, on cross-examination conceded that the full effect of the restrictions would be a reduction in value of approximately 50%. That same appraiser, however, in the supplemental appraisal introduced to give cognizance to the effects of the restriction, devalued his findings by only 10% to account for the almost positive removal. This compared to the 25% adjustment by claimants’ other appraiser, also for "almost certain removal”.
Although we would much have preferred to find a "restricted use value” (Nash v State of New York, 61 AD2d 852, supra) and to add an increment for the probable selective removal of the restrictions, the diverse and varied approaches taken by the three appraisers in their six appraisals preclude the utilization of this method.
Instead, we were compelled to utilize the comparable sales submitted by the respective parties in their "unrestricted bases” appraisals, thereafter adjusting for the probable effects of the covenant on the subject property by taking into consideration the proposed usages, the probable removal of the restrictions, the "depressing” effect these restrictions have on the market value of the property, even to prospective purchasers who are aware of the "certainty” of removal, and the further dampening effect on market value which arises out of the "reviewability factor” retained by Macy’s and Prudential.
Both of claimants’ appraisers utilized time adjustments in making their evaluations. One appraiser (Bailey) adjusted his comparables by 20% for every year prior to' 1970 and 10% for every year thereafter. The other of claimants’ appraisers contented himself with a 10% per year adjustment throughout. The State’s appraiser made no time adjustment to any of his submitted sales and averred that no time adjustment at all, at least from 1973, was warranted.
While we are of the opinion that time adjustments were definitely in order (and a time study for the location would have been of great assistance), the court holds that adjustments of as much as 65% for time alone are not indicative of true comparables and we have, accordingly, eliminated from our consideration those sales for which the appraisers made time adjustments (without time studies) of in excess of 50% or which predate the opening of the Smith Haven Mall in 1970.
Sale No. 3 of claimants’ "Bailey appraisal”, although it *537 involves a parcel of less than 2 acres as opposed to the subject’s 9 + acres, is the largest of the allegedly comparable sales offered in that appraisal. That appraisal indicates an upward adjustment of $50,000 per acre for the superior location of the subject, an adjustment which this court, after viewing the subject property and reviewing the testimony of the State’s appraiser, finds excessive.
The claimants’ "Breslin appraisals”, instead of being based upon a per acre value, involved the subdivision of the parcel into front and rear portions. Although we find his conclusions inconsistent in that his supplemental appraisal, encompassing as it does the less preferred and restricted option, results in a higher return, we nevertheless feel that his general approach takes more cognizance of the realities of the marketplace and the excessive depth of the subject tract.
The original Breslin appraisal envisions the subdivision of the property for commercial development of the first 250 feet in depth and the development of the rear portion for office buildings. His second and supplemental appraisal also adopts the same general approach but restricts full commerical development to the first 150 feet in accordance with the covenant. The rear portion is allocated for office building usage, in contravention of the restrictive covenant, but an allowance of 25% is made for its removal.
The Breslin "Sale #2” involved a sale, approximately a year after that of the subject, of a parcel of vacant land of about 1.7 acres. That sale, located near a neighborhood shopping center and with a considerable corner influence, received the smallest percentage adjustment of any of that appraiser’s comparable sales and we find it to be most indicative of true value.
That analysis is based on an evaluation of the frontage to a 250 foot depth with a discount for the remainder of the acreage of the parcel of 331/3% to allow for the limited access available to the rear area. In that expert’s supplemental appraisal, using only a depth of 150 feet, a square foot value of $4.45 instead of $4.05 was found. In that appraisal, however, the claimants’ expert made a 25% allowance for limited access and a further 25% allowance for the devaluing effects of the restrictive covenant with its almost "certain removal.”
The Breslin Sale No. 4 took place at approximately the same time as Sale No. 2 but seems to depict a considerably higher indicated value. On the basis of the testimony and our *538 viewing, we believe that this is due less to true comparability than to overevaluation of the subject’s corner influence, the disparity in size and the evident premium paid for prime bank sites.
On the bases of all the comparables submitted, we find that the average value per square foot of appropriated property was $4.35 on a fully unrestricted basis. In reaching this average valuation we have applied an increment in value because of the subject tract’s potentialities for subdivision for office building, and other like commercial uses. (Hewitt v State of New York, 18 AD2d 1128; Hewitt v State of New York, 20 AD2d 334.) We therefore find no reason to reach two distinct values for front and rear parcels.
The valuation of $4.35 per square foot unrestricted, would seem to be borne out not only by those comparable sales submitted by the claimants’ appraisers which were with the same time zone, but also by the sales alleged by the State’s appraiser to be comparable when valuing the tract as unrestricted.
The State’s comparables bear indicated values, again for fully unrestricted land, ranging from $3.26 to $4.27, without adjustment for time. As we noted previously however, we believe the evidence sufficiently warrants the application of a time adjustment.
We noted above that one of claimants’ appraisers discounted his total finding of value by 10% to reflect the market depressing effect of a certain to be removed covenant. The other appraiser hired by claimants, discounted the total value of the property by 25% or, computing in another manner, approximately $500,000 for a restriction which he did not honor (office buildings being restricted by covenant beyond the 150 or 250 feet). The State’s appraisals, of course, are based on fully restricted or unrestricted bases and result in a difference of over 100%.
The business of appraisals generally is very subjective, as every honest appraiser would acknowledge. The appraisers in the case at bar further acknowledged the extreme subjectivity involved in making an evaluation of a covenant which they deemed certain to be vacated.
This court has found that although the principals involved would have agreed to a waiver of the restrictions imposed by *539 the covenant, those restrictions would have been but selectively waived. We have found, therefore, that not only must we adjust for the existence of the covenant which, as claimants’ appraiser, Mr. Breslin, conceded, was "a detriment even if he thought he could get rid of the covenant”, but we must adjust even more for the selective retention of certain rights accruing to the owners of the covenant.
We have found the considerations involved to be as difficult as the Ohio Court of Appeals in Thormyer (169 Ohio St 291, supra) warned it would be.
However, after the most exhaustive review of the testimony and its presentation, and of the appraisals submitted, we find that a percentage adjustment of 20% for the full and total effect of the restrictions, as we believe it would be applied, is in order. The court believes that the 10% adjustment made by one of the claimants’ appraisers for the "almost certain” eventual removal is inadequate in that, among other factors, it fails to take into account our finding that any waiver of the restrictions would have been selective and that the concomitant reviewability factor has a necessarily depressing effect on market value. We also believe that whereas the 25% adjustment made by the other of claimants’ appraisers (also for "certain removal”) may be somewhat more accurate because of this reviewability factor, this percentage amount was applied only to the rear portion whereas the ultimate usage and value of the entire property is affected by the restrictions on the portion beyond the first 150 feet. We believe, therefore, that a 20% adjustment is adequately borne out by the evidence, and achieves a just and proper result based on all relevant factors.
Accordingly, it is the finding of the court that claimants are entitled to an award of $1,380,000 (rounded) for damages for the appropriation of 396,737 + square feet of their property, together with statutory interest from April 1, 1975 to the date of entry of judgment herein.
Notwithstanding that the claimants were left with approximately five acres, the instant appropriation was of an entire parcel and resulted in no consequential damages.
All motions not otherwise disposed of herein on which decision may have been reserved at trial, are herewith denied.

. Also as at bar, the Moschetti decision involved a question as to who had a right to enforce the covenant.

. In allowing testimony and evidence as to the possible removal, by agreement, of the restrictive covenant, we permitted inquiry of Macy’s high level employees of whether the covenant would have been removed "had Macy’s been asked.” We relied, in this connection, on the Court of Appeals final affirmation of a Court of Claims finding which was based on consideration of questions as to whether "had the claimants, prior to State acquisition, made an offer to purchase at fair market value all or part of the right of way * * * a reasonable likelihood existed that the railroad would have accepted such offer.” (Walker v State of New York, 33 NY2d 450, 453.) The question propounded in the case at bar is clearly analogous and thus likewise admissible.